Read, J.
(dissenting in part). The second sentence of exhibit D, paragraph (b) in the September 3, 2008 construction contract (hereafter, the contract) states as follows: “Liability should add the Metropolitan Opera Association as an additional insured and should include contractual liability and completed operations coverage.” While this sentence may be awkwardly phrased and infelicitously placed within exhibit D,[1] it is not ambiguous in light of the realities of the insurance marketplace. Given the *597 differences between owners and contractors protective liability (OCP) and comprehensive general liability (CGL) policies, this sentence clearly obligates Strauss Painting, Inc. (Strauss) to have in place a CGL policy protecting the Metropolitan Opera Association, Inc. (the Met) as an additional insured. With all due respect to my colleagues, there is simply no other way to read it. Accordingly, I respectfully dissent from so much of the majority’s decision as determined that the Met is not an additional insured on the CGL policy issued by Mt. Hawley Insurance Company (Mt. Hawley) to Strauss. For the reasons that follow, I would therefore answer the certified question in the affirmative.
I
An OCP policy covers the named insured’s liability for bodily injury and property damage caused, in whole or in part, by the designated contractor’s work for the insured on a specified construction project. The contractor purchases the OCP policy, which protects the insured from vicarious liability incurred as a result of the contractor’s acts or omissions on the project, and liability arising out of the insured’s own acts or omissions in connection with its “general supervision” of the work performed by the contractor (see generally Donald S. Malecki et al., The Additional Insured Book, International Risk Management Institute [IRMI] at 202-217 [7th ed 2013] [hereafter Malecki]; *598 Craig F. Stanovich, OCP Liability versus Additional Insured Coverage, IRMI [Oct. 2009] [hereafter Stanovich 2009], www.irmi.com/expert/articles/2009/stanovichl0-cgl-generalliability-insurance.aspx).
Mt. Hawley insists that the second sentence of paragraph (b) obligated Strauss to include the Met as an additional insured on the OCP policy that the first sentence directed Strauss to purchase for the benefit of Lincoln Center for the Performing Arts, Inc. (Lincoln Center). For this reason, Mt. Hawley criticizes the Appellate Division for “failing to recognize the critical distinction between the OCP Policy, on which the Contractor was expressly required to have the Met named as an additional insured, and the CGL Policy, for which no such requirement existed”; and argues that “as the owner of the property, Lincoln Center would have been listed as the owner on any OCP Policy. The Met would have been an additional insured on that policy” (emphasis omitted).[2] This is how Mt. Hawley tries to explain away the requirement to make the Met an additional insured.
Lincoln Center owns the opera house and is the Met’s landlord; however, as Mt. Hawley itself pointed out when responding to Travelers’ December 29th letter, Lincoln Center (the entity) is nowhere mentioned in the contract, which identifies the Met as the project owner. Thus, there is no basis within the four corners of the contract for interpreting paragraph (b) as requiring Strauss to purchase an OCP policy issued in the name of Lincoln Center. And it is not obvious how such a policy could have been obtained since Lincoln Center was not the party with which Strauss contracted to perform the work.
Next, the second sentence of paragraph (b) states that the policy on which the Met is to be included as an additional insured must provide “contractual liability and completed operations coverage.” “Contractual liability” in this context refers to the liability assumed by Strauss under the contract’s hold harmless and indemnification provision, while “completed operations” refers to coverage for injuries or damages occurring *599 after the construction project has been finished. These coverage options (i.e., contractual liability and completed operations) are available to an additional insured on a CGL policy; they are not, however, available on an OCP policy (see e.g. Craig F. Stanovich, Contractual Liability and the CGL Policy, IRMI [May 2002], www.irmi.com/expert/articles/2002/stanovich05.aspx7cmd [explaining how contractual liability insurance, found in the CGL insurance policy, applies]; Stanovich 2009 [“The OCP policy excludes coverage for bodily injury or property damage if such injury or damage takes place after the earlier of when the operation has been completed or put to its intended use by anyone other than another contractor or subcontractor working for the Designated Contractor on that project. The ISO CG 20 37 and many insurers’ independently filed additional insured endorsements provide coverage for the additional insured for bodily injury or property damage within the products and completed operations hazard. This coverage option is not available on the OCP policy” (emphasis added)]; Malecki at 58-60, 202). In short, the second sentence of paragraph (b) cannot mean that Strauss was required to purchase an OCP policy with contractual liability and completed operations coverage for the benefit of the Met as an additional insured because no such policy option exists. This pair of agreed-to coverages could only be provided by including the Met as an additional insured on Strauss’s CGL policy.
The Met sought in exhibit D to transfer or shift to Strauss in every way possible the risk of financial loss due to bodily injuries or property damages occurring in connection with the construction project by requiring Strauss to have in place (1) workers’ compensation insurance; (2) an OCP policy in favor of the Met as the named insured; (3) a contractual hold harmless and indemnification provision whereby Strauss assumed the Met’s tort liability arising out of construction operations; and (4) a CGL policy including the Met as an additional insured, which provided for contractual liability and completed operations coverage.
Known as the “belt and suspenders” approach, adding an indemnitee (here, the Met) as an additional insured on the indemnitor’s (here, Strauss’s) liability insurance gives “some protection to fall back on in the event there is a problem with the enforceability of the hold harmless agreement” (id. at 59-60, 69 [“(M)ost contractual risk transfers . . . involve using both an indemnity clause and additional insured status to work *600 hand-in-hand”]; see also The Handbook on Additional Insureds, American Bar Association at 38-39 [Michael Menapace et al. ed 2012] [“There are multiple reasons for a party to insist on both indemnification provisions and insurance requirements in a single contract . . . (T)he protection afforded by indemnification and hold harmless provisions, on the one hand, and additional insured coverage, on the other, are in many instances complimentary (sic) and not co-extensive. Thus, to maximize one’s protection, a party should include in the contract both an indemnification and hold harmless requirement and an additional insured requirement”]). Further, “[i]n the construction industry, general contractors and project owners who seek additional insured protection often will insist upon receiving [ISO endorsements allowing] coverage for both ongoing operations and completed operations” (id. at 51).
As Mt. Hawley points out, an OCP policy may be an alternative to adding the owner as an additional insured to the contractor’s CGL policy. But while there are advantages and disadvantages to each approach (see generally Malecki at 214-217), an OCP policy and additional insured status are not, as Mt. Hawley implies, mutually exclusive. Indeed, “[i]t is not unusual for an indemnitee to request both an OCP policy and additional insured status in the expectation that one of the coverages will apply in the event of a claim or suit” (id. at 216). Nothing (except perhaps cost and/or relative bargaining power) prevents a project owner from seeking to avail itself of the complementary advantages of both coverages, as the Met clearly did in this case.
Finally, Mt. Hawley contends that the Met sought OCP coverage in lieu of additional insured status as part of a “well-reasoned insurance scheme” since “[t]he OCP policy would provide the Met with protection arising out of [Strauss’s] work and, more importantly, ... an unshared $5M limit,” whereas, “[a]s an additional insured on [Strauss’s] CGL policy, the Met would . . . share the policy limits with all other insureds on the Policy — exposing the Met to a wasting of liability limits beyond its control.” Again, Mt. Hawley assumes that a project owner would only bargain with its contractor to provide OCP coverage or additional insured status on the contractor’s CGL policy, not both. It is certainly true that an OCP policy provides the named insured a separate set of limits, while CGL policy limits are shared by all insureds; that is one of the advantages that an OCP policy offers. But Mt. Hawley disputes that the Met was *601 the intended named insured on the OCP policy that Strauss agreed but failed to purchase; therefore, under Mt. Hawley’s interpretation of exhibit D, paragraph (b), the Met would not, in fact, have enjoyed the benefit of the unshared limits that Mt. Hawley contradictorily also claims motivated the Met to choose coverage under an OCP policy rather than additional insured status under Strauss’s CGL policy.
II
Because I conclude that the Met was an additional insured on Strauss’s CGL policy, I reach the issue of whether Mt. Hawley promptly notified the Met that it was disclaiming coverage on account of untimely notice (see Insurance Law former § 3420 [d] [an insurer wishing to deny coverage on account of late notice “shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant”]). On February 3, 2009 Mt. Hawley stated, in a letter sent to Travelers, that it was attempting to determine whether the Met qualified as an additional insured under the policy.[3] The word “disclaim” does not appear in this letter, and the word “denial” shows up only in the context of Strauss or the nonparty Lincoln Center. As to the Met, Mt. Hawley advised Travelers that “we need to determine whether Strauss Painting was actually involved in this work in order to determine whether [the Met] is added as an additional insured. At this point in time, [Mt. Hawley] reserves the right to assert that [the Met] is not an additional insured.” In its letter to Travelers dated March 4, 2009, with a copy to the Met, Mt. Hawley stated that it was investigating how early the Met was aware of the Mayo incident. While this letter recited the policy’s notice conditions, it merely cautioned, in the conditional tense, that “[sjhould the information that we have been provided be correct, no coverage would apply” to the Met (emphases added).
In sum, the two letters constituted ineffective notice because they did not disclaim coverage; instead, they reserved the right to disclaim coverage in the future (see Hartford Ins. Co. v County of Nassau, 46 NY2d 1028, 1029 [1979] [“A reservation of rights letter has no relevance to the question whether the insurer has *602 timely sent a notice of disclaimer of liability or denial of coverage”]; Norfolk & Dedham Mut. Fire Ins. Co. v Petrizzi, 121 AD2d 276, 277 [1st Dept 1986] [“A letter from an insurance company to its policyholder which contains a reservation of the insurance company’s rights to disclaim coverage under its policy is not such a notice of disclaimer as to satisfy the requirements of the Insurance Law”]). Because Mt. Hawley never disclaimed for late notice, it waived the late notice defense (see Hartford Ins. at 1029 [“A failure by the insurer to give such notice as soon as is reasonably possible after it first learns of the accident or of grounds for disclaimer of liability or denial of coverage, precludes effective disclaimer or denial”]).
Judges Graffeo, Smith, Pigott, Rivera and Abdus-Salaam concur; Judge Read dissents in part in an opinion in which Chief Judge Lippman concurs.
Order modified, without costs, by denying Metropolitan Opera Association, Inc.’s motion for summary judgment on its first cross claim and, as so modified, affirmed, and certified question answered in the negative.

. Exhibit D, entitled “INSURANCE REQUIREMENTS,” states in its entirety as follows:
*597 “a. Workman’s Compensation Insurance covering contractors employees meeting all statutory requirements prescribed in New York State.
“b. Owners and contractors protective liability insurance with a combined single limit of $5,000,000.00. Liability should add the Metropolitan Opera Association as an additional insured and should include contractual liability and completed operations coverage.
“c. Comprehensive General Liability. Combined coverage for property and bodily injury with a minimum single limit of $5,000,000.00 (Limits may be met with an ‘Umbrella Policy!)], “d. Contractor will supply the Metropolitan Opera Association with a Hold Harmless and indemnify them against any and all claims arising from their work relative to this agreement.
“e. Contractor will furnish the Metropolitan Opera Association an Original Owners and Contractors policy. Also will provide certificates of insurance for the Workman’s Compensation, the Comprehensive General Liability and the ‘Umbrella’ Policy, prior to the commencement of the contract.
“f. All insurance policies must contain a clause that insures the Metropolitan Opera Association a 30 day written notification of cancellation or non-renewal of policy.”

. Apparently, the only ISO (Insurance Services Office, Inc.) endorsement available for use in adding an additional insured to an OCP policy is the “Additional Insured — Engineers, Architects or Surveyors (CG 20 31)” endorsement (see Malecki at 214, Appendix B), which obviously is not relevant here. In other words, there is no such thing as standard policy language for a lessee who contracts with a contractor for a construction project on the leased premises to become an additional insured on an OCP policy. This is not surprising since the lessee under such circumstances, as is the case with the Met here, would be the named insured on the policy.

. In this case, the Met did not raise the issue of whether an insurer may validly disclaim coverage by sending written notice to the insured’s own carrier only (see Sierra v 4401 Sunset Park, LLC, 24 NY3d 514 [2014] [decided today]).